Please all rise. Hear ye, hear ye. This Honorable Appellate Court for the 2nd Judicial District is now in session. The Honorable Robert D. McClaren resigned. Please be seated. The first case on the dot is 1-2-23-0229. The North Shore Gas Company and the People's Gas Lighting Company, Petitioner's Appellants, v. Illinois Commerce Comm'n, and the People of the State of Illinois, Ex Rel. Kwame Rahul, Attorney General of the State of Illinois, Respondents at Lease. Arguing on behalf of the Appellate, Ms. Elizabeth Mercosi. Arguing on behalf of the Appellate, Illinois Commerce Comm'n, Mr. Thomas R. Stanton. Arguing on behalf of the Appellate, People of the State of Illinois, Ex Rel. Kwame Rahul, Ms. Lee John. Thank you. Is your name pronounced Mercosi? Yes. You may proceed, ma'am.  May it please the Court. Elizabeth Mercosi on behalf of North Shore Gas Company and the People's Gas Lighting Co. Company. For brevity, I will refer to the companies as the companies, the Illinois Commerce Commission as the ICC or the Commission, and the Illinois Attorney General's Office as the EG. Thank you for the opportunity to speak today on behalf of the companies. This is an appeal from the Commission's review of the actions the companies took in 2018 to collect unpaid customer bills and to reduce uncollectibles expense. So it would make sense if you are here today to discuss the actions the companies actually took in 2018. That is what the law requires. But that is not why we are here today. We are here today for one simple reason. The Commission has now decided to penalize the companies for its 2017 collections actions that it already reviewed and it already approved in its 2017 reconciliation case. And we know that the Commission approved those actions because it approved the company's reconciliation in full. It could not have done that unless it also reviewed and deemed prudent the company's collections actions. That is what the law requires. Are you saying that the law requires that 2017 not be considered? Yes, Your Honor. As I will explain, there is a limited statutory scope under the statute and it requires annual reconciliations. And a part of those reconciliations, the Commission reviews the prudence of the company's collections actions during the period at issue. Have you ever heard of Fram Oil Filters? No, I have not. They used to have a marketing program about pay me now or pay me later. And it was supposed to be either you buy a filter and change it whenever you change the oil or you are looking at a new engine somewhere down the road at great expense. Why doesn't that marketing principle apply in this case insofar as those things that didn't happen in 2017 because of self-imposed limitations on disconnections and other forms of recovery were delayed until 2018? Well, the principle doesn't necessarily apply in this case because the General Assembly, when it enacted the applicable statute, it limited the Commission's review to the company's collections actions during the reconciliation period. So by the law, the Commission is limited in the actions that it can review on behalf of the companies. So the 2017 collections actions of the companies were primed for review in the 2017 reconciliation case, which does occur after calendar year 2017. And you cited the section of the statute in the group?  Yes, sir. But now the ICC is using the exact same 2017 conduct as the basis of a $16 million disallowance. To be clear, absolutely nothing has changed in terms of the controlling law and absolutely nothing has changed in terms of the surrounding facts. What has changed is one thing that does not and legally cannot support the basis of a disallowance. That is, this case was not mitigated until 2022. That opened the door for the AG to claim that it could revisit the company's 2017 collections actions based on more recent financial data. But the law requires that the Commission review the prudence of the company's collections actions at the time they were made using only information available at that time. Hindsight review is prohibited. Because this after-the-fact, more recent financial data cannot be the basis of a disallowance, the Commission's order is arbitrary and capricious and it requires reversal. But this Court should also reverse the Commission's order for a second reason. There is no reasonable basis in the record for the theory behind the disallowance. What exactly did you mean by hindsight review? So, at the time a utility makes a decision, if the Commission is going to review the prudence of that decision, it is restricted to using only information known to the utility at that time. In other words, it cannot use after-the-fact information to judge the results of the utility's decision. How does this relate or correlate to res judicata, collateral estoppel, or estoppel by judgment? Well, they are two separate issues, Your Honor. In this instance, hindsight review is one of the governing prudence rules that guides the Commission when it evaluates the prudence of utility actions. And res judicata, in this case, is the principle that the Commission's orders do not necessarily have precedential effect. Does res judicata even apply to administrative agencies? It does not, Your Honor. I'm sorry? It does not.  I think there are six factors that are supposed to be deliberated upon or considered. Yes, Your Honor. How is the Commission's finding that the Corporation's utilities did not comply with those six factors? I believe, if I understand what you're asking, is if the Commission reviewed those six factors and then deemed the collections actions inappropriate? Well, they made findings, I believe, that several of the factors weren't complied with. I think it's fair to say, yes, okay, no disconnects, no notice of disconnects. Yes. And so how are the findings against the manifest way to the evidence? Well, first, Your Honor, the collections actions of the utility at issue in this case were those in 2018. The Commission already reviewed the company's collections actions in the 2017 case, knowing that they did not comply with factors 5 and 6, but yet still found that their collections actions were prudent. And we know this because they approved their reconciliation amount in full. And there is record evidence in the 2017 reconciliation that the reason the companies paused actions 5 and 6 was to protect consumers during a customer information system upgrade. And they weighed the cost or the negative aspects of accident. What is the definition of reconciliation? A reconciliation, it's a review of the amounts that the companies collected under their rider, their rider UEA, and then there's a true-up. It's an after, it's a backwards-looking proceeding where the Commission ensures that the companies collected no more and no less than the actual amount of the uncollectibles incurred. Didn't you object to witness Miner's testimony on the basis that she wasn't an accountant? That was one of the reasons, but I think the more sound explanation for that objection was that it was a complicated accounting methodology to prove, to allegedly prove, cause and effect for her proposed disallowance. The reason why I'm asking these questions is because it seems to me that reconciliation is more in the nature of an accounting as opposed to the rationale on which the accounting is based. And so when you say that there's a correlation, that because the reconciliation was accepted, that the reason or the motive or the factual background, the history of, or the context of the reasons for the accounting agreement is somehow presumed to be appropriate when in fact there were findings that it wasn't appropriate, that it was imprudent or unreasonable. So there's two parts of the statute. It requires the Commission to review the accuracy of the reconciliation statement, but it also requires the Commission to review the prudence of the company's collections actions. Here in the 2017 case, the Commission reviewed both and approved both, finding the company's collections actions to be prudent. But now in this case, it is using after-the-fact financial data, which is prohibited as hindsight, to now deem those exact same collections actions to be imprudent. You said after-the-fact data. What are you referring to if the data was collected in 2018? I believe, Your Honor, the data was collected later than 2018 because we're referring now to the company's collections actions in 2017. So the Commission is supposed to review the company's collections actions using data that was available in 2017. But the AG's introduction of after-the-fact data, post-dating 2017, is beyond the statutory scope and it constitutes hindsight. So you're saying that all the data related to 2017 and didn't relate to anything that might have happened in 2018? No, Your Honor. The AG's expert introduced financial data from 2017 through 2019. So if you're reviewing the 2018 collections actions, there is no argument or claim by the AG that those collections actions were imprudent. Her sole basis for her disallowance is based on the company's 2017 collections actions. And the data that was introduced to allegedly show they were imprudent post-dates the 2017 reconciliation period. I don't have any other questions right now. I'll continue then. Okay. We believe that this Court should also reverse for a second reason. There is no reasonable basis in the record for the theory behind the Commission's disallowance. To have merit, there must be evidence showing that the company's 2017 collections actions in fact caused 2018 uncollectibles to increase. In other words, there must be evidence of cause and effect. There is no such evidence. And we know this because the AG's own expert admitted multiple times on the record that the impact of the company's 2017 collections actions on 2018 uncollectibles was, quote, unknowable. Well, she suggested that the amount was unknown, but not the theory. Not the theory under which, in other words, not a specific dollar amount, but accepting her theory that if you don't collect in this year, the amounts are significantly higher the following year. She actually stated she presumed that to be the case. She didn't introduce any evidence showing that was in fact the case. So is it your position that the dollar amounts did not go up as a result of a lack of disconnects in 2017? It is our position that there has been no evidence introduced showing that. Isn't it your burden? It is our burden to prove our prima facie case that the company's reconciliation statements were accurate and that the company's collections... There's no argument that the numbers are what they are. The question is whether or not you pursued it prudently. Say that quickly. That you pursued it prudently. Yes, Your Honor. We maintain that we did pursue the collection actions in 2017 prudently. And maybe it would help if I give a little bit of context about those actions. So in 2017, the companies made a pro-consumer decision to pause customer disconnections during a period when it upgraded its software system. And before it made that decision, it convened with the Commission's technical and consumer representative staff and vetted that... It's its internal staff. Correct. Yes. But you didn't vet it with any outside consumer organizations or the AG's office for that matter, correct? That is correct. Okay. And the companies explained to staff that they were going to pause disconnections until the upgrade was complete and billing was stable. And they also explained that they were going to do this so they would avoid accidentally or inadvertently disconnecting customers during that upgrade. You may finish. Thank you, Your Honor. And the record shows that that was standard utility practice. At least seven other utilities at that same time had done the exact same thing during a system upgrade. And the record also reflects that the companies continued all other collections actions during that time. So the companies strongly maintain that they approached and carried out the disconnection moratorium in 2017 prudently. When you say standard utility practice, though, correct me if I'm wrong, but your examples were out-of-state utilities. They were not necessarily similarly... Oh, sorry. Sorry. Oh, it's your fault. I tell myself that. They were not necessarily utilities, other utilities in Illinois are similarly situated in Illinois, correct? That is correct because those utilities were introduced in response to a data request from the AG or discovery. And they did not qualify whether they were looking for only Illinois utilities. Nonetheless, you never supplied any similar data from an Illinois utility. No, because that data wasn't known to the company at the time. But we do now know that a similar situated Illinois electric utility has done the same thing while it's implementing a new customer information system. That's not in the record, though, right? It is not, Your Honor. I have no other questions. Thank you. What accounting process did the corporations use? FIFO? LIFO? I'm not sure, Your Honor. Well, if it was first-in-first-out, wouldn't that at least imply that there's a correlation between any delay in 2017 would, if it's first-in-first-out, result in increased disconnections and whatever relative to the next immediate year in question? That would not be the company's position, Your Honor. There are a number of factors that go into the amount of uncollectibles. We're talking about, one, isolated collections actions, disconnections. But beyond even the collections actions, there are economic factors. A given customer could receive state funding, energy assistance, that could help or otherwise reduce an account receivable uncollectible as compared to an uncollectible write-off. So we do not think that this connection moratorium alone, and the evidence in the record does not show, that it was the only reason that there was a difference between 2017 and 2018 uncollectibles. There was a suggestion that because there is essentially a requirement that during the winter months, I think it was four months, that disconnections were not allowed, that maybe the implementation or the startup of the system should have commenced during that period such that it would have coincided with the prohibition and would have significantly reduced the probable or possible problems arising out of the concerns of the startup and how it might impact improperly the collection billing and the disconnection process. Can you tell me why, if you know, why it wasn't commenced at that time? It's a little bit like putting snow tires on for the winter months and then taking them off in the summer months, kind of like. Understood, Your Honor. Based on my knowledge, the software system itself wasn't ready for implementation until April and the companies actually understood that these types of upgrades are very complex and can take time. And also they wanted the system to be fully implemented and billing to be stable actually before the next winter moratorium, which started, I believe, in November. Okay, thank you. Yes, sir. Thank you. You'll have an opportunity to make your bubble. Thank you. Thank you. Mr. Stanton, you may proceed after she gets back to her table. Thank you. Identify who you represent again for the record, please. Absolutely, Your Honor. Good morning, Your Honor. May it please the Court. Tom Stanton, Special Assistant Attorney General on behalf of the Illinois Commerce Commission. The appellees have split their 15-minute session. and divided the argument in two ways. I'd like to address the company's arguments as to the Commission's finding that they violated the Act when they unreasonably and imprudently suspended disconnection activities as part of the computer system upgrade in 2017. And then Lee Jonig, on behalf of the people of the State of Illinois, she's from the Attorney General's Office, she'll address the company's arguments as to the Commission's disallowance, the 16.2 disallowance. So Section 19-145C requires the companies to minimize and collect uncollectibles through six listed collection activities, including the activities at issue in this case, the serving of disconnection notices and actually implementing the disconnection of the customers. However, the companies violated that requirement by deliberately suspending these disconnection activities as part of that computer system upgrade. You knew about that in 2017. Why not object to it then? Well, you know, the issue wasn't before and no one raised it was not a contested issue in that 2017 case. But it was certainly knowledge you had. I mean, they were very upfront about it. Here's what we're doing. Yeah, but in that particular case, in the 2017 reconciliation order, none of the uncollectibles at issue in that 2017 case were attributable to the suspension of disconnections. We know that because of their collection practices. Mr. Barron testified that... So is it your position then if somebody says, here's what we're doing, and you just sit there and keep saying nothing, object, that they're responsible, it's like their own risk as to how it might affect the following year's reconciliation? So the reconciliations reconcile particular years, so that was the 2017 reconciliation. And the uncollectibles that they sought to recover in that 2017 reconciliation proceeding, none of those uncollectibles were attributable to the suspension of disconnections. Right. But as counsel said, when we get to 2018, it's about 2018. You're reaching back to factors that you attribute to the increased uncollectibles. But none of the customer rearages were known or the uncollectibles. They didn't seek recovery for those increased uncollectibles. So the suspension of disconnections... But there were no increased uncollectibles in 2017. They were in 2018. Absolutely. And does the statute, or does it not, put a boundary around the data for a particular year? No, it absolutely does not. And why is that? There's nothing in the statute that restricts the commission from looking at any activity to determine the appropriateness of the collection activities, the collectibles that they're seeking in that particular year. In this particular case, the suspension of the disconnection activities in 2017 increased the customer rearages and led to increased uncollectibles in 2018. As I was mentioning before, none of the uncollectibles at issue in the 2017 proceeding were or could have been attributable to their suspension of those disconnection activities because... When the decisions were made in 2017, it was made based on the data they had then. And then the decisions made in 2018 is based on what they knew then. Right? You're looking at what the uncollectibles that they're seeking recovery for. So in the 2017 proceeding, they were seeking recovery of uncollectibles that were not caused by the disconnection, by the suspension of that disconnection. They suspended the disconnection from April until the end of the year. Right? The uncollectibles that they were seeking recovery for in 2017, they were not part of. They were not attributable to the conduct at issue in the 2017 reconciliation order. In 2018, that's when they came in and they requested recovery for those 2018 uncollectibles because they declared... So all of the disconnections that would have taken place in 2017 were delayed and deferred to 2018. So in that case, we look back and we see, well, why were these uncollectibles so high? We look back to the cause of those uncollectibles, and it was the suspension of disconnections in 2017. But again, in 2017, nobody objected to the disconnections. Right. But as to because it would have been inappropriate for the commission to look at the justice and reasonableness of their suspension, because none of the uncollectibles that they were seeking in 2017 pertained or were impacted. So nobody in the commission thought, gee, I wonder if this is going to raise their uncollectibles. That was just not on the table. Well, again, at the time, the uncollectibles that they were seeking in 2018, that's where the increase occurred. But there was no evidence in that case. There were no contested issues in the case. I mean, they summarized their position of what they did, but the commission just summarized that in the party's position section. The commission didn't make a particular finding as to the prudence or reasonableness of that conduct. And again, as I mentioned, it would have been... Wait, hang on a second. Did you say in 2017 no one made a finding that their actions of 2017 were prudent? No, no, on the suspension of disconnections. Again, it would not have been appropriate for the commission even to consider the suspension, right, because the commission determined that it was imprudent and unreasonable. The commission could not have imposed a disallowance because the uncollectibles that they were seeking recovery for in that 2017 proceeding were not attributable to the suspension. That's the whole point. It wasn't... They weren't attributable to the suspension in 2017, but they were in 2018. So they're seeking to recover the higher uncollectibles in 2018, so the commission properly looked at the cause of that. Why were these uncollectibles so high in determining the prudence and reasonableness of their collection efforts? So the commission looked back at the suspension. Again, there's no hindsight analysis here. The commission wasn't looking at... They were looking at exactly pages 22 and 23 of the commission's order. The commission was looking at what information the companies had at the time when they were planning, implementing the computer software upgrade, and what information they had at the time in terms of... And you're talking about in April of 2017? April of... That's the same information that you had as well. You knew what they were doing. Well, we... Right. I said they were planning, but you didn't know the effects of that. You wouldn't know the effects of that. Well, how would they know the effects then? Well, we wouldn't know the effects... No, no. How would they know the effects? Well, sure. You have to make the decision based on what you know at the time you make the decision. Right. So how did they know what the effects were going to be? Where's the evidence of that? We're talking about... Respectfully, but answer the question.  If you didn't know, how would they know? Well, they implemented the customers in the upgrade. The companies would know what information they had at the time. What would a reasonable company do at the time? Rather than suspend the disconnection activities, they should have maintained the disconnection activities, put different measures in place so they would maintain these disconnections because they knew. Did you raise that to them in 2017? No. Okay.  I have no further questions. I have a question. Sure. The reconciliation and the application for 2017 reparations or indemnification or payback or coverage is based upon accounting data, is it not? The reconciliation is. So there's two parts to the reconciliation proceedings. There's a reconciliation...  There's two parts to the reconciliation proceedings. It's the accounting review or the reconciliation. So they do the uncollectibles in, say, 2017. They collect those uncollectibles from customers in 2018. And then the reconciliation is in 2019. And you look to see what they did to recover. The uncollectibles are recoverable. How much did they recover from customers? And that's the reconciliation. So if it's less or more, you want to make sure exactly what is the prudency review, then it goes to whether they can recover that full amount. And that's where... The point is that I'm getting at, at least my feeble attempts are, to discuss the amount of money that was requested in 2017. Okay. And that was based upon figures that were correlated through accounting practices. Was there anything in 2017 that suggested that they were entitled to more money based upon any other factor or less money based upon any other factor? Put another way, if you put in an invoice and the invoice gets paid, it gets paid because somebody believes that the amount of money that you're requesting is reasonable. How were you supposed to know that the request in 2017 was sorely undervalued? Because apparently, it's either a FIFO situation where based upon the passage of time, things inaccurately move forward. And if they do, then either you get recovery from those things that happened in 2017 which were not reconciliated because there was no evidence of the need for reconciliation. And since there was no need for additional reconciliation, how is it that the knowledge that the department had would negatively imply that you are a stop from bringing up facts, historic facts, that later on indicated that there was impact in 2017 that wasn't presented to the commission for reconciliation? I think you're absolutely right. I don't know. I'm not proselytizing. I'm just asking questions. Yeah. So in the reconciliation, they come in with a number. In 2017, they declared a certain number amount of uncollectibles. In 2018, they recovered that amount, attempted to recover that amount from customers. You can't get an exact number. Typically, you can't get an exact number depending on customers' usage and things like that. So they recovered it from customers. They charged customers that number. And then the following year, the reconciliation is looking at those two numbers. What did they declare and what did they recover from customers? That's just simply an accounting review. On top of that, that's the first part of the reconciliation. The second part of the reconciliation is the prudence review. Were their collection efforts prudent? Did they comply with all requirements of the statute? And so my point is, in the 2017 proceeding, none of the uncollectibles at issue in that proceeding were a result of the suspension of the disconnection activities. So the commission would not have looked at that. It would have been inappropriate for actually the commission to look at that, make a determination of prudence or reasonableness, determine that it was imprudent or unreasonable, and then impose a disallowance because none of those uncollectibles at issue in the 2017 proceeding were the result of the suspension of disconnection activities. We know that these rearages increase. There's testimony in the record that the customer rearage has increased because of these disconnection activities. It's from Ms. Miner. And the companies told the commission back in 2016, in the 2016 reconciliation, they said without these disconnection activities, customer rearage has increased and for some customers will grow unabated. So we know that suspending these disconnection activities increases customer rearage, the unpaid balances between customers, and those unpaid balances ultimately turn into uncollectibles. Thank you. Okay. Any other questions? Thank you, sir. Thank you, Your Honor. Mr. Miss, rather, is it Gonnig? Gonnig. Give her the same time she should have been outlining. Yes, sir. Thank you. You can bend it back up to down and then up. I hope that works. May it please the Court. Assistant Attorney General Lee Gonnig on behalf of the Attorney General. As counsel for the commission explained, there's no real dispute here that the companies did not comply with all of the required collection activities that are listed in the statute. So the commission was then faced with the question of determining how much of the requested uncollectibles to disallow. That is a factual determination that this Court should affirm as long as it's supported by substantial evidence in the entire record. And here it is. The commission adopted the only method of determining a disallowance that was found in the record, and that was the time-based method that Ms. Miner testified to, where she explained that she recommended a disallowance based on the amount of time that the companies represented. Has anybody ever used that theory before? No, because this is the first proceeding in which there was, you know, this amount of admitted suspension of disconnection activities. Where's the basis of reliability for that theory? The basis is just the common sense. Well, first of all, it's sort of the common sense understanding of the amount of time that disconnection activity is suspended is tied to the amount of collections that are foregone. And Ms. Miner testified to this relationship. She explained that when you stop disconnection activities, it causes arrearges to increase because customers, you know, when they get disconnection notices, that prompts them to make payments. It's a scary notice, and it gives them information about payment plans. And I will add that the company's expert also testified to this relationship. He testified that disconnection notices prompt customers to make payments. So I have a question. So the numerator is eight months, right? That's the suspension of disconnection activity.  Where did the 20 months come from? The 20 months came from the understanding that 2018 was, it contained, that the amount that was requested contained kind of the normal course of uncollectibles that were, you know, that just would have come about in 2018 regardless. And then it also contained these eight months that had been foregone in 2017 that were then moved into 2018. So that's where the, so it's 12 plus eight, essentially, which is where that denominator comes from. So you're counting both the 2017's December and 2018's January, February, March, and December. Those are months where there's no disconnects anyway. So why are those months counted? So the eight months comes from the commission's finding that the suspension occurred for a year. And that was based on the company's discovery response. But then they took into account the fact that four of those 12 months were during the winter months when there wouldn't have been disconnection anyway. And that's how they got to eight. Well, why not apply that to 2018 when January, February, March, and the following December, no disconnections? The commission did not expressly address that argument because the companies didn't make it. And the commission, I think, when it was looking at, when it was using the 12 months in 2018, it sort of makes sense to do so because it's just sort of assuming that without the inflation from the suspension of disconnections in 2017, it would have been just a regular year in 2018. So it should have been treated as a regular year. And to the extent that the commission could have made some sort of additional adjustment to the 12 months, that's a factual decision that the commission is empowered to make as the expert agency charged with these decisions. Even if that could have been a potential alternate calculation, the commission's findings on that point should only be reversed if it's against the manifest weight of the evidence. And so just providing... How do I conclude that there could have ever been disconnects during the winter months? Isn't that absolutely against the manifest weight of the evidence? It's correct that there would not have been disconnections during the winter months, but I think what the 12 months does is it essentially treats 2018 like, treats the 12 months of 2018 as though it would have been a normal year. With four months of no disconnects always? Two, I think. Yeah. January, February, March, and December. Correct. Okay. Can I take judicial notice that December is in a different year than January and February are, unless they happen to have the same number in the year? So are we talking about December of 2017, or are we talking about December of 2018? My understanding is that in every calendar year, there are no disconnections in January, February, and March, and then again in December. So obviously when they're sort of looked at as one season, it goes from December of one year to January, February, March of the next year, but then in a given calendar year, it's... So which calendar year were we referring to in this colloquy between you and Justice Jorgensen? Were we talking about December of 2017 and January, February, March, and then December of 2018? What's the year? In other words, it would seem to me, and I could be wrong, that when we're talking about the months that are involved, they would theoretically have different years, like when you talked about January, February, March, and then December. That would be either 2017 or 2018. So the Commission's determination of the disallowance was based on the understanding that 2018, had there not been this disconnection, suspension, would have been a normal year, so that's 12 months. And then the suspension created... Basically, there were not disconnections from April of 2017 through November of 2017, which is 8 months. So that's where that 8 months comes from. So then 2018 is a normal year, and then the extra 8 months comes from this suspension, again, based on the Commission's finding that the suspension actually occurred for a year based on the later discovery response that the companies gave. And that discovery response also establishes the causal relationship between suspending disconnections and increasing... and increased uncollectibles later on. That causation was also established by Ms. Miner's testimony about this causal relationship, by the company's experts' testimony about how disconnection notices prompt payment, and by the company's acknowledgement in even earlier proceedings before the Commission, which they do not address in their reply brief, about this causal relationship. So the record certainly supports the causation there. One other question. What is the calendar or the fiscal year for this issue here? Is it January to December 31st, or is it July 1st to June 30th, or what is it? It's a calendar year, but the calendar year that's being reviewed there is the amounts that are collected. If you look at the statute, when it refers to an annual review, it's an annual review of the amounts collected. It's not an annual review of the collection proceedings that... excuse me, the collection efforts that led to those amounts. That's why, at the time of the 2017 proceeding, the only thing before the Commission, as counsel for the Commission explained, was the amounts collected in 2017, not what collection actions led to that, because that just wouldn't really make any sense, because companies would be able to just, you know, avoid making prudent collection efforts as long as they waited until the following year to write something off. So it's annual for the amounts that are collected. I don't think you actually... you said calendar year. Excuse me, it's January 1st through December 31st, is my understanding. I wanted to specifically state it as to what your understanding of a calendar year was. Okay. Thank you. Any other questions? No, sir. I have one question. Just in practice, so at the end of the calendar year, there is some period in which data is collected. At what point is the review conducted for the prior calendar year? It's when the companies submit their reconciliation petition to the Commission. I believe here that submission was in 2020. So for this calendar year 2018, I think the docket number is 2020, so the companies submitted their petition in 2020. There was, you know, the proceedings took some time. I believe the order was issued in 2022, though it could have been in 2023. I apologize for not being certain, but there's some delay. Thank you. Thank you. Ms. Raposo, you may proceed. Ms. Raposo. May it please the Court. I would first like to address the fact that opposing counsels now stated numerous times that the collections actions of the companies during the reconciliation period are not under review. That is wrong. The company's collections actions that they took during the reconciliation period are directly under review. The statute says directly that the Commission is required to review the prudence of the company's collections actions. And in the 2018 case, that would have been the company's 2018 collections actions. But counsel also says repeatedly that they wouldn't have participated in the 2017 reconciliation case because the cause or the alleged cause or the impact of the disconnection moratorium wasn't yet known. But the Illinois law is crystal clear on this. In a reconciliation proceeding, to evaluate prudence, you are not allowed to use after-the-fact information. That would be punitive, and it would derail the purpose of a prudence evaluation, which is, again, to judge the utility's decision-making process, not the result of that decision. And what the disallowance here is doing, it is the results-driven adjustment that is solely reliant on after-the-fact information to penalize the companies for an otherwise prudent and sound pro-customer decision. And again, we would note that the reason that they have to keep referring to this alleged cause or the impact is because the AG's own expert witness admitted multiple times that the difference between the 2017 and 2018 uncollectibles was, quote, unknowable and impossible to know. She stated that she merely presumed there was an impact. But the applicable standard is substantial evidence, not a mere presumption or back-of-the-napkin math. There must be substantial evidentiary support for her methodology and the Commission's disallowance. But we would also note that the AG's disallowance was entirely unsupported, but then the Commission's order went even further. It built on her unsupported methodology and increased it by $5 million without identifying any rational methodology to support that increase. This also requires reversal because Commission orders must be supported by substantial evidence. And there is no such evidence here, as the AG has admitted multiple times. And then to use after-the-fact, results-driven information to penalize the companies for something the Commission already reviewed and had already found prudent in the 2017 case. I want to back up on the after-the-fact review. Obviously, any reconciliation is looking retrospectively at data. At what point is there a cutoff in the ability of the Commission here to look at old data? So the Commission is bound or limited. It's a limited-scope review, so they are only allowed to use data that was known in the reconciliation period, here calendar year 2018. So in the 2017 case, they would have been limited at just the same. They would only be able to review the company's 2017 collections actions during that case. So when you're looking at the, let's say we're looking at 2017, there's a reconciliation process for calendar year 2017. And at some point, the reconciliation year was agreed to, right? There was no contested matter in that reconciliation process? No, no, Your Honor. All right, so at that point, you're saying there's, in effect, a forfeiture of any ability to review any decisions made in 2017? In this case, Your Honor, yes. If they were not raised in the 2017 case, the Commission cannot then just raise them here. The Commission has other avenues if they believe that there was a wrongdoing done that they can use to address some of the alleged wrongdoing. But reviewing that in this reconciliation proceeding is in direct conflict with the statutory language. You're essentially arguing that the Commission should have anticipated the surge or the increase in the number of disconnections. And having done so, what would the solution have been? Would the Commission have been correct in denying any recompense? Would it create an algorithm based upon trends that would determine a percentage of this plus possibly anticipate and suggest the next year that there should be a percentage denied based upon the increases? If the concept of, after the fact, reconciliation is a viable remedy, then what should the Commission have done in anticipation of what is the obvious, which is if you don't disconnect in 2017, then you either will never disconnect and the cost will balloon, or you will disconnect in either 18, 19, 20, or some X number of years. So what's your solution to the problem involved with situations where disconnections are postponed indefinitely? Well, it is our position that the disconnection moratorium was prudent, and it was explained in detail in the 2017 case. And the Commission found no objection to pausing customer disconnections during this period to protect customers. And to your statement, or the... Wait a second. You said protect customers. Are you talking about delinquent customers? Or are you talking about the customers that are now going to have to pay the cost of the bills for the people who didn't pay? Or are you talking about some sort of combination of the both? I would say a combination of both, Your Honor, and that's why there are a number of factors. But I think it's very important to remember that there is no evidence showing that the moratorium increased 2018 uncollectibles. And the company submitted data with its application for rehearing showing that 2018 uncollectibles wasn't an outlier or out of the norm. There have been other years from 2015 to 2022 showing that the uncollectible levels in 2018 were not significantly higher or, in some cases, they were lower than in other years. There are... Wasn't there testimony that, I mean, my notes show a 58% increase for North Shore, 24% for People's Gas in the one-year uncollectibles. Wasn't there data presented? That was used... The data compares, excuse me, But again, sitting in 2017, the time during which the companies made the decision to implement the moratorium, those figures were not known. So it is not fair to then use that data to then punish them backwards looking. No, I understand that. But their argument is that it was knowable that there would be an increase because any time you suspend disconnections, people know that and... No, the AG's witness stated it was unknowable that the impact of pausing disconnections in 2017 on the level of 2018 uncollectibles, in her words, unknowable. Well, the number may have been unknowable, but the fact of an increase... No, she also said that any impact was presumed. And I think a counsel for the Attorney General's Office also said that it would be common sense. Well, respectfully, the record does not reflect that and it actually shows that 2018 wasn't uncharacteristically high. And again, you cannot base a $16 million disallowance on mere presumption. There must be substantial evidence supporting this disallowance. And there is not. And for that reason, we believe it is arbitrary and capricious and it must be reversed. Is the time up? Yes.  Time flies when you're having fun. We'll take the case under advisement and render a decision at halftime. There will be a short recess. We have other cases on the call.